Our second argument of the day comes in Appeal 25-2025. The Associated Press and others v. Ron Neal, Warden. Okay. Mr. Weeks, right? Yes. Good morning to you. Nice to see you whenever you're ready. And we have Ms. Smith, right? Good morning. Good morning. May it please the Court. My name is Lynn Weeks, and with Chris Condiff, I represent an appellant. The Court should vacate the District Court's denial of preliminary injunction and remand for a determination as to whether Indiana is likely to meet the constitutional burden required to close its executions. There are two First Amendment principles at issue. Number one, to protect the informed discussion of governmental affairs, the Constitution limits when the government can close certain proceedings. And second, the press serves the public by checking the government, by facilitating discourse, and by serving as the public's eyes and ears. Laws that unduly or significantly restrict those functions must be treated with a healthy dose of skepticism. When the Indiana Supreme Court enters an order setting an execution date, the result is a highly regulated event that takes place after midnight, but before dawn, in the Department of Corrections Support Services Building. Under the status quo, the press, during the execution, stands out in the parking lot, literally and figuratively in the dark, while Indiana conducts its execution. A Department of Corrections employee then walks out to the parking lot and wordlessly puts a press release in a mailbox. All that's in that press release is the time of death and the state's account of the prisoners' last words. Indiana is an extreme outlier in this regard. Of the 27 other death penalty states, Wyoming is the only other one with no access for the press in public. And Wyoming has no prisoners on death row and has only executed one person since the Gregg decision in 1976. The Press Enterprise 2 framework is the correct one for determining whether Indiana can close executions to the public, including the press. Indiana should be required to make a case-by-case showing that it has a constitutionally adequate justification for keeping the press from observing an execution. In the Supreme Court's 1986 Press Enterprise decision, which we've called Press Enterprise 2, the court reversed the decision of the California Supreme Court. The California Supreme Court had concluded that the First Amendment was not implicated because the proceeding in question was not a criminal trial but a preliminary hearing. But the Supreme Court said, the First Amendment question cannot be resolved solely on the label we give the event, trial or otherwise. This echoed the Justice Stevens concurrence in Press Enterprise 1. And the concept is drawn from the decision in Globe newspaper in which the court said, the purpose of First Amendment protection for observers is to ensure that the constitutionally protected discussion of government affairs isn't informal. This isn't an open door. It's a relatively high bar. And the test works well. We pointed the court to several decisions in which the experience and logic factors resulted in no presumption of access for the press. In particular, we've pointed the court to a Sixth Circuit case, United States v. Miami University, in which the Sixth Circuit applied the Press Enterprise 2 factors to find no qualified right of access to observe student disciplinary proceedings. There was no tradition of access to those proceedings. And the court found that the logic factor also didn't favor access because public access would make the proceedings prohibitively costly and because it would undermine their teaching function. In Detroit Free Press, the Sixth Circuit decision, the court said, drawing sharp lines between administrative and judicial proceedings will allow the legislature to artfully craft information out of the public eye. So the label isn't dispositive. And it makes no sense, in addition, it makes no sense to assess executive proceedings differently than judicial proceedings. But why are we getting, I guess, when we're looking at Press Enterprise, why are we getting that one off the shelf? If the context here is, unless we're representing that the context of where the speech is being held is a, what we would call a public space. Are we already at that point? Are we accepting that this is a place that is normally accessible to the public? It's a different framework, Your Honor, from the public forum analysis. So the illustration that I think distinguishes the two frameworks is in criminal trials, right? There's an undisputed right of public access to criminal trials under the Press Enterprise 2 factors. And yet, if there's an additional expression or speech right asserted, like a request to videotape the proceeding, that's when we go into a public forum analysis or another analysis like content neutrality, viewpoint neutrality, time, place, manner, right? So the public forum analysis isn't for observing government proceedings. It's for other types of expressive content. But would you have to accept, though, that before the question when we're asking about right of access to the press in particular, the question that the Supreme Court forces us to answer is whether or not this is a place or a space where access has typically or historically been granted. I think the question that the Supreme Court poses is whether the public has typically, whether there have typically been observers allowed to observe that type or kind of proceeding. That's language from El Vocero, Puerto Rico, the Supreme Court case. Again, that's a case where we're dealing with the courtroom, where the Supreme Court was able to conduct that analysis because they had already accepted the type of space where the conversation is being held. And so going back to framing the question, because this is a right of access question that's being posed here, is why are we not starting with the forum? In particular, this particular proceeding, before we get there, we're asking the question, in particular in the First Amendment context, where is the speech being held? So I disagree that the specific place that the proceeding is being held is what controls the analysis. I think Press Enterprise 2 is clear that we look to the history of observers in the type or kind of proceeding rather than the specific place. And you can see in the Press Enterprise 2 decision, for instance, the court traces the history of criminal trials in Press Enterprise 1, Vaudeer, and in Press Enterprise 2, preliminary hearings, throughout the common law era and through the colonies. And those proceedings weren't always held in the same type of place. Trials, just like executions, came from the public square into the courthouse. And yet the court still looked at the tradition of that type or kind of proceeding throughout history. That's the experience prong of Press Enterprise. In the Press Enterprise, in particular, when looking at the question of the historical context, when they were looking at the place, the context of where experience, where those things were being held, in particular, they really emphasized the point that juries are making trials public or necessary to furthering the goal of justice, ensuring that the public is holding the justice system accountable to ensuring that those individuals that are being tried are being fair and it's effective. And so when the court was no longer a place where people congregated to watch trials, the Supreme Court articulated that now the press has somewhat become the surrogate of the public and still continuing to hold them accountable, trials, trials. And so when we're looking at the experience, in particular, of executions that have become at least been private since the 1800s, why would that correlate on the experience prong? I agree with the premise, Your Honor, but I disagree with the second part of your point there. So I would not say that trials became private in the 19th century. I think what happened is that they... No, no, executions. Executions, excuse me. Not trials. Not trials. They moved from the public square into the jail yard. But in many, many cases, they still had large groups of public observers. And the most useful resource I've found for this is the book by Professor Banner. In that book, Professor Banner describes that move from the public square to the jail yard, and he says, Journalists were always allowed a place at jail yard executions. Contemporaries recognized that the newspaper was serving as a substitute for public hanging. And in fact, Professor Banner specifically links that move from the public square to the courthouse with the development of the newspaper as a mass medium. The newspaper reporters could come into the trial and serve as the public's ears, writing accounts of what had happened during those executions. And in fact, that would still be true today, given your point that of the 20 death penalty states, all of them are granting access to the press. So the press is still in the jail yard witnessing the execution in parallel with the historical example here, in all but the two states, Indiana and Wyoming. Correct. Correct. In every state that is currently carrying out executions, the press either has a—there's a written statute on the books or a Department of Corrections policy, or in the case of Arkansas, an informal policy of permitting the press to attend the execution. Could you spend a couple minutes on your—you might want to save some rebuttal time, too, I realize—but on your press clause argument? It seems—it sure seems to me that what you're asking for there—and I understand it. You have an amicus brief that is pretty well done that came in. You're asking for an extension of law there, not kind of an application of law as it currently stands. Is that a fair reaction? I think what we're asking for is an application of the Supreme Court's development of the test of general applicability, which it's developed through the free exercise clause, to the press clause context. And I think the main press clause case that we draw on is the Minneapolis Star case, where there was a differential treatment between the press and others. So to put that more specifically, the importation of the Smith framework, the free exercise Smith framework into the press clause of the First Amendment. Not the framework that followed the Smith case. And the reason you're doing that, of course, I understand it, is because it will trigger an application of strict scrutiny. Correct, and I think that the reason is important, right? When laws restricting First Amendment rights have exceptions for those who aren't engaged in First Amendment activity, the question—the natural question becomes, why? Why are those exceptions granted? And so that general applicability framework that the Supreme Court has developed through Church of Lukumi Babu-Iye, through the Tandon v. Newsom decision, and through Fulton v. City of Philadelphia, those are a way of sort of smoking out when a First Amendment restriction is disguised as something else. And to return to the Minneapolis Star case, the Supreme Court said there, differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and that such a goal is presumptively unconstitutional. So, right, so the comparison is, the state will assert an interest in keeping executions closed. Can the interest in keeping the press out be justified the same way, or is that interest already subverted to the extent it will be by allowing the observers who are currently allowed in? I mean, under current law, they have held, the justices have held, that the press just does not have, under the press clause, special, more weighty constitutional access than the public. So that's why I think it's an extension. So it's up to them, if the court were to go that way, they could bring in that whole line of the Smith jurisprudence, extend some of the other lines of cases that you're talking about, but they haven't done it yet. Well, I think how I read those cases is that there is no guarantee of a special right of access for the press. I think the treatment of that issue in the Alvarez case, ACLU versus Alvarez, was particularly instructive. I think in that case, it was, Judge Sykes went through some of the Brandsburg decision, for instance, and saw that there actually was a balancing occurring there, although it went, in that case, against the press. I'll reserve the rest of my time. Thank you. Yeah, you're quite welcome. Okay, Ms. Smith. May it please the court. This court should affirm the denial of media plaintiffs' request for a preliminary injunction. Despite characterizing their claim as one for public access, all media plaintiffs seek is press-only access to executions in Indiana. They want access to the Indiana State Prison to gather information to report on Indiana executions, and no amount of deflection or mingling of doctrines can change the underlying nature of their claim. They are not concerned with public access, but their own ability to observe executions for reporting purposes. And this type of claim is governed by forum analysis. But even if media plaintiffs' claim were one of a general right of public access, the Supreme Court has long held that the press is not entitled to access beyond that afforded to the general public, and it is well-established law that the public does not have general access to penal facilities. Those facilities may permissibly impose restrictions based on correctional officials' expertise and the purview of the legislature. What do we do with counsel's suggestion, though, at looking in particular, this is where Indiana has the executions? With the understanding, though, historically executions, the public had access to those proceedings, and that's leaning into that Ninth Circuit case. So we don't even get to that question, Your Honor, unless we determine that executions are proceeding within the meaning of the press framework. And neither this court nor the Supreme Court have extended press so far. Other than deflecting, I understand that we're not there. I'm saying if, the hypothetical, if we are there. So under press, we not only look at the process of executions, but we do also look at the place. So I believe you pointed that out to my friend on the other side. So we do have to look at that is part of the consideration in the historical context of the place where they occur. So that is part of the analysis. So we do have to consider the fact that executions occur and have been historically conducted at Indiana State Prison since the 1850s, and that the public does not have a right and has not had a right of access to penal facilities. But going back to... How do you, if we're in the press enterprise 2 world, how do you respond to the argument on the other side that there's a pretty robust tradition before the middle of the 19th century and more recently, at least in a lot of other states, super majority of other states, of providing access? So there has been... There's a lot of experience in the history of the United States with members of the public attending execution, or I mean, members of the press attending executions. So there was, a couple of hundred years ago, executions were open to the public. They were held in town squares and out in the open. And then beginning in about the 1830s, those were moved away from the public into the private. And in Richmond newspapers, the court said, which is where the press foundation that Experience and Logic Test originated from, the court said that the tradition has to be uncontradicted and unbroken. So we're looking at whether or not that has been a continuous tradition. And it certainly hasn't for executions. Those have been private. The public has not had general access, even if there have been some designated witnesses. That is still not a general right of public access to executions. And that, I think, is a distinction that is missing from the media plaintiff's argument. And it is extremely important in the analysis of the historical context. It hasn't been generally... Executions have not been generally accessible to the public. And I think one of the things that we also have to take into consideration... That's your way of saying that when it comes to invited access or extending an opportunity to a defendant or a victim's family members that way, invitation access is not the same as public access. That's correct, Your Honor. And I think another thing that's extremely important to consider when we are considering the history of executions is the Eighth Amendment's impact on how those have transformed over the last couple of centuries. The Eighth Amendment requires that we measure the constitutionality of punishment based on evolving standards of decency. So the Eighth Amendment demands that capital punishment evolve, that it change. And that is why those executions started to shift into more private affairs. They were becoming spectacles. There were, I think, we cite an article in our brief about the execution of Rainey Bethea, which was, I think, one of the last recorded executions in the country in about 1936. There were some 20,000 people. The crowds were so large, they were becoming unruly. They were for entertainment at that point in time. And the Eighth Amendment started to, the evolving standards of decency, started to require those to be private and less barbaric, to be less of a spectacle. And I think that— If you're talking about evolution, you also see the Supreme Court over the years having an evolving, a pretty consistent and evolving understanding of the role of the press, and that the press is the eyes and ears of the public, and that if we want an informed citizenry and discussion of government affairs, and all of this is very important. And so having the press have access to government functions is really critical to all of that. And that's a pretty unbroken line, even before press enterprise, dating back a few years earlier to Richmond newspapers, and then through Globe, and et cetera, et cetera. So there's a consistency there and an evolution there. So I'm not sure that focusing on the Eighth Amendment evolution, particularly since that discussion also brings us back to what we were discussing with your opponent, which is that most states are granting this access. So when we're talking about some of those policy considerations and the importance of the public's knowledge of state-sanctioned executions, that would go to kind of the logic portion of the experience and logic test. I'm kind of actually above that. I'm at the level where the Supreme Court is deciding what the First Amendment means and what is this relationship to the question of access to government functions. And I don't take the media plaintiffs to be asking for an unqualified right of public access. Is that what you understand them to be asking? I do. So they're not asking. The respondents see the media plaintiffs' claim as one of a specialized right of access. They are not asking for the general public to be permitted into executions. They are asking for, very specifically, media members only to be allowed to view Indiana's executions, and that is a specialized right of access. And they are asking for that in order to report, to gather information and to report on those executions, which is an expressive pursuit. And this court recently said in MacIver that when access to government property is being sought for expressive pursuits, that is analyzed under forum analysis. And under forum analysis, this is a nonpublic forum, and the statute of regulation only has to be content neutral and reasonably related to a legitimate government interest. Let me ask you to distinguish Pell for me for a minute on this subject. I'm sorry, I couldn't hear you, Your Honor. I said let me ask you to distinguish Pell for me on this point. Because when Pell was looking at the right of access in terms of the press to prisons, Pell said we know at the outset this regulation that was being challenged is not an attempt by the state to conceal the conditions in its prisons or to frustrate the press's investigation and reporting of those conditions. Indeed, the record demonstrates that under current corrections policy, both the press and general public are accorded full opportunities to observe prison conditions. So the Supreme Court seemed to be saying in Pell, you know, if we had a regulation here that was silencing the press, preventing the press from reporting on prison conditions or what's happening inside a prison, that would be no good. But we don't have that here. We have something else, and that's what we're ruling on. Then when I hear you this morning, you seem to be arguing the press wants to go in and report on executions, and we can't have that. I apologize if that's the way that it came off. Because I think that Pell is directly on point, and that's what we've said in our brief, and that's what we're presenting here today. Because the press is being treated just like the general public here. They are permitted to view executions if they meet one of those statutorily defined exceptions, if they are a victim, if they are a designated witness from the offender. They are permitted. And, in fact, in the record there's a declaration from Casey Smith with the Indianapolis Capital Chronicle who witnessed the execution of Joseph Corcoran. So they are permitted. The respondents are not prohibiting media plaintiffs from witnessing executions. They're not prohibiting them from interviewing witnesses, from interviewing victims, if they would like to speak, from interviewing a spiritual advisor. Again, Joseph Corcoran's spiritual advisor was interviewed and went on record after his execution. So they are fully able to report on executions and present that to the public. What they cannot do is be their own primary source of the information. And there is no First Amendment right for the press to do so. But if I could get back to a point I think that you were trying to make with the policy considerations and the importance of the press with the First Amendment and the underlying principles of press, I think there is a distinction between those principles and the rationale for press and open trials and what we have here. The trials play a unique role in our judicial system, and they ensure the fairness and accuracy and truth in a pre-guilt determination process. And press was aimed at that, ensuring that fairness and accuracy for the defendant, particularly because those were aimed at criminal trials, and this court has extended those principles to civil trials because of that extreme importance. But when we get to an execution, that is the implementation, the carrying out of a sentence. And the offender has already received that public trial and even a public appeal. They have already received the benefit of those, the rationale that was underlying press. Now, I don't disagree that there are important policy considerations, but those go to the logic element of the press framework, and they don't go to whether or not press in and of itself should be extended to executions. And because those underlying policies and rationales for press do not exist for executions, this court should not extend a Supreme Court precedent or the precedent of this court to apply the press framework to executions, and it should apply the standard it set forth in McIver and apply the forum analysis. If there are no further questions, the respondents would request that this court affirm the denial of the preliminary injunction. Thank you. Thank you. Mr. Weeks, you've got a little bit of time left. Let's see. I'd like to start with this Eighth Amendment discussion. Humane administration of executions in compliance with the Eighth Amendment are enhanced by public observers. In the Woodford case, the court said, to determine whether lethal injections are fairly and humanely administered or whether they ever can be, citizens must have reliable information. Same thing in Philadelphia Inquirer. Same thing in the recent Tennessee Nelson decision. Even the Arkansas Times decision, which went the other way, acknowledged that there is a strong logic component to permitting public observers at executions. And I think it's important to note that the executions carried out in Indiana over the past half year are the first under its new drug protocol. So the importance of public oversight is even higher if that's possible. In addition, since I didn't touch on logic before, there is a strong logic component to both the community catharsis aspect of executions, as well as to their deterrent effect. I did want to touch also on the idea that there's a requirement of an unbroken, uncontradicted history of access. That's language from the Richmond newspaper's decision that the court found a broken, uncontradicted history for trials. That level of access is not required. Press Enterprise 2 just requires whether the place and process have historically been open to the press and general public. We also point the court to the Detroit Free Press decision that says even when there have been some elections allowed, this is a 6-3 case, the question is whether the general policy has been one of openness. We ask that the court vacate the denial of preliminary injunction and remand for a determination as to whether Indiana is likely to meet its constitutional burden. Thank you. Thank you, Mr. Weeks. Again, Ms. Smith, thanks to you and the state as well, we'll take the appeal under advisement.